UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

MICHELLE LOCKHART & ERIKA SHICK,        )
     *Plaintiffs*,        )
             )
*vs.*        )        2:11-cv-0037-JMS-WGH
             )
EXAMONE WORLD WIDE, INC., *et al.*,        )
     *Defendants*.        )

## **ORDER**

Plaintiffs Michelle Lockhart and Erika Shick allege claims for intentional infliction of emotional distress, negligent infliction of emotional distress, and invasion of privacy by intrusion upon seclusion, stemming from an observed urine collection drug test ordered by their employer, Defendant The Western and Southern Life Insurance Company ("Western & Southern").[1]  Presently pending before the Court are two motions for summary judgment.  First, Western & Southern moves for summary judgment on Ms. Lockhart's claims against it.[2]  [Dkt. 103.]  Second, Defendants American Medical Review, Inc. (d/b/a ExamOne Indianapolis) ("AMR"); Estate of Stephen Ammerman[3] ("Mr. Ammerman"); ExamOne World Wide, Inc. ("ExamOne"); Quest Diagnostics (d/b/a LabOne, Inc.) ("LabOne"), and Allison Price ("Ms. Price") (collectively, the "Collection Defendants") move for summary judgment on Ms. Lockhart and Ms. Shick's claims against them.  [Dkt. 105.]  Because Plaintiffs' claims stem from the same incident and there is some, although not complete, overlap between the arguments presented by Western & Southern

---

[1] Plaintiffs withdrew their claim for false imprisonment during briefing, [dkt. 125 at 54]; therefore, the Court enters summary judgment in favor of all of the Defendants on that claim.

[2] Ms. Shick did not file any claims against Western & Southern.  [Dkt. 54 at 17 (allegations from Ms. Lockhart alone against Western & Southern).]

[3] Mr. Ammerman died during the pendency of this litigation, [dkt. 55], and his estate was substituted as a party defendant, [dkt. 60].

and the Collection Defendants, the Court will address both of the pending summary judgment motions herein and differentiate between the arguments presented by specific parties when necessary.

# I.
## STANDARD OF REVIEW

A motion for summary judgment asks that the Court find that a trial based on the uncontroverted and admissible evidence is unnecessary because, as a matter of law, it would conclude in the moving party's favor.  *See* Fed. R. Civ. Pro. 56.  To survive a motion for summary judgment, the non-moving party must set forth specific, admissible evidence showing that there is a material issue for trial.  Fed. R. Civ. Pro. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits.  Fed. R. Civ. Pro. 56(c)(1)(A).  A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact.  Fed. R. Civ. Pro. 56(c)(1)(B).  Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated.  Fed. R. Civ. Pro. 56(c)(4).   Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially the grant of summary judgment.  Fed. R. Civ. Pro. 56(e).

The Court need only consider the cited materials, Fed. R. Civ. Pro. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary

judgment motion before them," *Johnson v. Cambridge Indus.*, 325 F.3d 892, 898 (7th Cir. 2003). Furthermore, reliance on the pleadings or conclusory statements backed by inadmissible evidence is insufficient to create an issue of material fact on summary judgment. *Id*. at 901.

The key inquiry, then, is whether admissible evidence exists to support a plaintiff's claims or a defendant's affirmative defenses, not the weight or credibility of that evidence, both of which are assessments reserved to the trier of fact. *See Schacht v. Wis. Dep't of Corrections*, 175 F.3d 497, 504 (7th Cir. 1999). When evaluating this inquiry, the Court must give the non-moving party the benefit of all reasonable inferences from the evidence submitted and resolve "any doubt as to the existence of a genuine issue for trial . . . against the moving party." *Celotex*, 477 U.S. at 330.

## II.
### BACKGROUND

The following facts, though not established as objectively true, are supported by admissible evidence and accepted as true for purposes of ruling on the pending summary judgment motions. Moreover, while the Defendants deny certain allegations—for example, whether Ms. Price asked the Plaintiffs to bend over during the observed collection—they recognize that the Court must accept those allegations as true, since the Court is required to view the facts in a light most favorable to the Plaintiffs when ruling on a motion for summary judgment. [Dkt. 106 at 7 n.6; *see also* dkt. 107-5 at 22 (deposition testimony from Ms. Price that she did not ask the Plaintiffs to bend over).]

Ms. Lockhart became a sales representative for Western & Southern in 2007 and was licensed to sell life and health insurance. [Dkt. 127-2 at 6.] Ms. Shick became a sales representative for Western & Southern in 2010. [Dkt. 127-3 at 6.] At all relevant times, Western & South-

ern had a drug testing policy.  [Dkt. 127-8.]  The policy established a procedure for random drug tests and for cause drug tests but did not disclose the possibility of observed drug tests.  [*Id.*]

In late August and early September 2010, Western & Southern's corporate office received phone calls from Rodney White, an estranged spouse of Western & Southern employee Angela White, claiming that Ms. White had provided her drug-free urine to other employees in the Vincennes office to use for workplace drug tests.  [Dkt. 107-1 at 7-8, 25-26, 27-30.]  Mr. White identified several employees by name but did not identify either of the Plaintiffs.  [Dkt. 107-1 at 10, 27-30.]  Mr. White alleged that Ms. White had a square bottle in her desk that she filled with urine that could be used by someone else.  [Dkt. 107-1 at 10.]  Mr. White did not make any allegations about Ms. Lockhart or Ms. Shick.  [Dkt. 107-1 at 10.]

Because of these allegations, Western & Southern formed an investigation team, consulted with an in-house attorney, and reviewed its drug testing policy.  [Dkt. 107-1 at 9.]  Western & Southern also reviewed a policy issued by the United States Department of Transportation ("<u>DOT</u>"), which contained procedures for observed drug tests.[4]  [Dkt. 107-1 at 42.]  Western & Southern searched Ms. White's desk for the square bottle that Mr. White alleged she used to provide her urine to other employees, but it did not find a bottle.  [Dkt. 107-2 at 26-27.]  Ultimately, Western & Southern decided to conduct an unannounced observed drug test on all employees within the Vincennes district, which included the district office in Vincennes and sales offices in

---

[4] The part of the regulations governing "Procedures for Transportation Workplace Drug and Alcohol Testing" applies to entities that conduct tests "required" by the DOT concerning the activities of various transportation employers.  40 C.F.R. § 40.1.  There is no evidence, and the parties do not argue, that Western & Southern was a transportation employer governed by the DOT procedures.  Instead, the evidence shows that Western & Southern consulted the DOT procedures in making the decision to conduct an observed drug test, [dkt. 107-1 at 42], and that a sheet summarizing the policies was provided to Mr. Ammerman and Ms. Price, [dkts. 107-1 at 24; 107-4 at 37; 107-5 at 18].

Terre Haute and Linton. [Dkt. 107-1 at 9, 42.] The DOT procedures gave Western & Southern "confidence that there was a procedure that would be followed." [Dkt. 107-1 at 42.] Ms. Lock-hart and Ms. Shick were to be included in the on-site observed drug test "[b]ecause they work[ed] at the Vincennes office not because there were any specific allegations against them." [Dkt. 107-1 at 10.]

Western & Southern contacted LabOne to arrange the on-site observed drug test. [Dkt. 107-1 at 62.] LabOne, a national organization and wholly-owned subsidiary of Quest Diagnostics, sent the request to ExamOne, a wholly-owned subsidiary of LabOne, [dkt. 107-2 at 7], which sent the request to AMR, a local organization doing business as ExamOne Indianapolis, [107-4 at 5]. AMR contacted Mr. Ammerman, a business contact who did paramedical exams and drug testing for various insurance companies.[5] [Dkt. 107-4 at 29.] Mr. Ammerman confirmed that he could conduct the on-site observed drug test at Western & Southern on September 27, 2010. [Dkt. 107-4 at 34.] AMR faxed Mr. Ammerman a copy of the DOT observed collection procedures and asked him to find a female who could observe the drug tests for the women at Western & Southern. [Dkt. 107-4 at 36, 56.] Mr. Ammerman contacted Ms. Price, a former nurse who he knew when he was a maintenance supervisor at a nursing home, and she agreed to observe the female employees. [Dkt. 107-4 at 36, 37.] Mr. Ammerman told Ms. Price that he would pay her $10 for each female she observed. [Dkt. 107-5 at 18.]

On September 27, 2010, Mr. Ammerman drove Ms. Price to the Western & Southern Vincennes office. [Dkt. 107-4 at 38.] Mr. Ammerman discussed the DOT observed collection procedures with Ms. Price and provided her with a written copy of a sheet summarizing those

---

[5] Seventy-five percent of the work that Mr. Ammerman did was for AMR. [Dkt. 107-4 at 30.] Drug testing was only 5% of AMR's business, [dkt. 107-4 at 9], and Mr. Ammerman testified that the drug testing work he did for AMR was "not often," [dkt. 107-4 at 17].

procedures.  [Dkts. 107-4 at 37; 107-5 at 18.]  It was the first time Ms. Price had worked with Mr. Ammerman to conduct a drug test, and she did not work with him again.  [Dkt. 107-5 at 20.] Ms. Price did not speak to anyone at AMR, ExamOne, or LabOne before the testing at Western & Southern.  [Dkt. 107-5 at 31.]

Western & Southern arranged to have members of its corporate staff present at each location where the drug testing would occur.  [Dkt. 107-1 at 18.]  Tarah Corlett, a human resources manager for Western & Southern, was present at the Vincennes location.  [Dkt. 107-2 at 21, 33.] Ms. Corlett made an announcement to the employees at the Vincennes location that there was going to be an observed drug test because Western & Southern felt that its drug testing policy had been compromised.  [Dkt. 107-2 at 63.]  Ms. Lockhart did not hear the group announcement, [dkt. 127-2 at 30], and it is unclear whether Ms. Shick did, [dkt. 127-3 at 10-13].

When Ms. Lockhart arrived at work, another employee, Richard Hall, approached her and handed her an empty bottle and asked her to urinate in it for him because a urine test was being conducted and Mr. Hall did not believe he would pass.[6]  [Dkt. 107-21 at 15-16.]  Ms. Lockhart refused.  [Dkt. 107-21 at 18.]  Mr. Hall then asked Ms. Shick, who also refused.  [Dkt. 107-20 at 14.]

Ms. Lockhart and Ms. Shick began working at their desks.  [Dkts. 107-21 at 19; 107-20 at 15.]  After fifteen or twenty minutes, Carolyn Saenz, a paralegal with Western & Southern, approached Ms. Lockhart and took her to a room to ask her some questions regarding drug use. [Dkt. 107-21 at 19-20.]  After answering Ms. Saenz's questions, Ms. Lockhart went back to her

---

[6] Mr. Hall was one of the associates that Mr. White implicated when he called Western & Southern about his concerns.  [Dkt. 107-2 at 25.]  Mr. Hall ultimately failed his observed drug test. [Dkt. 107-6 at 36.]  He denies knowingly smoking or ingesting marijuana or asking either of the Plaintiffs for their urine.  [Dkt. 107-6 at 19, 27.]  Mr. Hall did not lose his job after the failed drug test.  [Dkt. 107-6 at 36.]

desk and continued working.  [Dkt. 107-21 at 21.]  Ms. Lockhart did not tell Ms. Saenz that Mr. Hall had asked for her urine.  [*Id.*]

Less than thirty minutes later, Ms. Price came to Ms. Lockhart's desk and asked her to follow her to the restroom.  [Dkt. 107-21 at 22-23.]  Ms. Price told Ms. Lockhart that she was going to need a urine sample and asked Ms. Lockhart to remove her vest.  [*Id.* at 23.]  Ms. Lockhart removed her vest, and Ms. Price told Ms. Lockhart that she needed to lift her shirt up "right below [her] breasts" and pull her pants and underwear down "just below [her] knees."  [*Id.*]  Ms. Lockhart complied, and Ms. Price told her that she "needed to turn around and bend over."  [*Id.*]  Ms. Lockhart asked why she needed to do that, and Ms. Price told her "it was procedure" and that "people hide things up there."  [*Id.*]  Ms. Lockhart turned around and bent over, and Ms. Price told her that she could stand up.  [*Id.*]  Ms. Price handed Ms. Lockhart a cup and told her she needed to urinate into it.  [*Id.*]  Ms. Lockhart started to close the door to the stall, and Ms. Price grabbed the door and told her she could not close it.  [*Id.*]  Ms. Lockhart urinated into the cup while Ms. Price watched, and then Ms. Lockhart handed the cup back to Ms. Price.  [*Id.*]  Ms. Price watched Ms. Lockhart wipe herself and pull her pants back up.  [*Id.*]  Ms. Lockhart washed her hands and put her vest back on.  [*Id.* at 24.]  Ms. Price straightened Ms. Lockhart's vest as she was putting it back on.  [*Id.*]  Ms. Lockhart could feel Ms. Price's hands as she straightened her vest.  [Dkt. 127-10 at 2.]

Ms. Lockhart went back to her desk and got a cigarette.  [Dkt. 107-21 at 25.]  She was on the verge of crying and felt humiliated.  [*Id.*]  She saw Ms. Shick walking out from her interview with Ms. Saenz,[7] [dkt. 107-20 at 17], and the women went outside and Ms. Lockhart told Ms.

---

[7] When Ms. Saenz questioned Ms. Shick, Ms. Shick told her that Mr. Hall had asked her for her urine.  [Dkt. 107-20 at 17.]

Shick what had happened, [dkt. 107-21 at 25].  After Ms. Shick was called inside for her test, Ms. Lockhart went to her desk, got her stuff, and went home.  [Dkt. 107-21 at 25.]

Ms. Price came to get Ms. Shick and took her to the bathroom.  [Dkt. 107-20 at 18.]  Although no one told Ms. Shick if there were consequences for refusing the observed drug test, Ms. Shick felt that she would lose her job if she refused.  [*Id.* at 22.]  Ms. Saenz testified that if any employee had refused the test, it is possible that it would have affected their employment.  [Dkt. 127-5 at 28.]

Inside the bathroom, Ms. Price helped Ms. Shick remove her vest.  [Dkt. 107-20 at 22.]  Ms. Shick could feel Ms. Price's hands as Ms. Price helped her remove her vest.  [Dkt. 127-11 at 2.]  Ms. Price performed the same procedure that she used with Ms. Lockhart by asking Ms. Shick to raise her shirt to just below her breasts, lower her pants and underwear to below her knees, and bend over.  [Dkt. 107-20 at 22.]  Ms. Shick asked Ms. Price why she had to do that, and Ms. Price said it was procedure so that people couldn't hide things.  [*Id.*]  Ms. Price watched as Ms. Shick urinated in a cup, wiped, and pulled up her pants.  [*Id.*]  After the test, Ms. Shick got her things and left to go to a friend's house.  [*Id.* at 19.]  Ms. Shick felt that the procedure was humiliating, and she felt violated.  [*Id.* at 21.]

Later that day, Ms. Lockhart spoke with Ms. Shick by phone, and Ms. Shick confirmed that she had to do "the same exact thing" for her observed drug test and that she was upset.  [Dkt. 107-21 at 25.]  Ms. Lockhart also spoke to her manager, Cleora Wagner, who confirmed that Ms. Price used the same procedure during Ms. Wagner's drug test.  [*Id.*]

Ms. Lockhart and Ms. Shick initially filed suit in Knox Circuit Court in January 2011.  [Dkt. 1-1.]  The Defendants removed this case to federal court, alleging that this Court has diver-

sity jurisdiction.[8]  [Dkt. 1.]  The operative Complaint alleges claims for intentional infliction of emotional distress, negligent infliction of emotional distress, and invasion of privacy by intrusion upon seclusion against the Defendants.  [Dkt. 54.]

## III.
### DISCUSSION

### A.  Applicable Law

In a case such as this one in which federal jurisdiction is premised on diversity of citizenship, state law applies to substantive issues and federal law governs procedural issues.  *Fednav Int'l Ltd. v. Cont'l Ins. Co.*, 624 F.3d 834, 838 (7th Cir. 2010).  Because Indiana law applies on substantive matters, the Court must attempt to predict how the Indiana Supreme Court would decide the state legal questions at issue.  *Mindgames, Inc. v. W. Publ'g Co.*, 218 F.3d 652, 655-56 (7th Cir. 2000).  This Court will not expand the scope of state law beyond its current bounds. *Estate of Moreland v. Dieter*, 576 F.3d 691, 700 (7th Cir. 2009).

### B.  Ms. Lockhart's Common Law Claims Against Her Employer

Ms. Lockhart alone alleges Indiana common law claims against her employer, Western & Southern.  [Dkt. 54 at 17.]  The parties do not mention the Indiana Worker's Compensation Act ("IWCA") in their briefing, but it is worth noting that the Act generally provides "the exclusive remedy for recovery of personal injuries arising out of and in the course of employment."  *GKN Co. v. Magness*, 744 N.E.2d 397, 401-02 (Ind. 2001).  The IWCA typically bars this Court from hearing any common law claim brought by an employee against her employer for an on-the-job injury.  *Id.*  However, non-physical injuries such as emotional distress "are not barred by the ex-

---

[8] The Court ordered the parties to file a joint jurisdictional statement so that it could confirm that diversity jurisdiction did, in fact, exist.  The statement was accepted as sufficient to establish diversity jurisdiction.  [Dkt. 96.]

- 9 -

clusive remedy clause of the [IWCA] because, alone, they present no injuries covered by the act." *Perry v. Stitzer Buick GMC, Inc.*, 637 N.E.2d 1282, 1298 (Ind. 1994). Accordingly, because there is no dispute that her alleged injuries are solely emotional, Ms. Lockhart was not required to bring her claims against Western & Southern under the IWCA.

Likewise, it is undisputed that Ms. Lockhart alleges common law claims and does not bring any claims under the Indiana Employer's Liability Act ("IELA"). Ind. Code § 22-3-9-1. Therefore, the IELA does not apply to this case, *City of Hammond v. Biedron*, 862 N.E.2d 110, 112-13 (Ind. Ct. App. 1995), and the Court will address Ms. Lockhart's claims against her employer under Indiana common law.

**C. Vicarious Liability**

The Collection Defendants emphasize that the Plaintiffs' allegations focus exclusively on the allegedly tortious conduct of Ms. Price, [dkt. 106 at 10-11], for which they contend they are not liable, [dkt. 106 at 19-25]. Specifically, the Collection Defendants argue that AMR provided its services as an independent contractor, that Mr. Ammerman was an independent contractor of AMR, and that Ms. Price was an independent contractor of Mr. Ammerman. [Dkt. 106 at 19-25.] Therefore, the Collection Defendants contend that they are not liable for Ms. Price's allegedly tortious behavior.

In response, Plaintiffs argue that the Collection Defendants are vicariously liable for Ms. Price's conduct because Ms. Price and Mr. Ammerman were acting as employees of AMR, and AMR was acting as an employee of ExamOne and LabOne. [Dkt. 125 at 34-46.]

*1) Determining a Worker's Status*

The long-standing general rule in Indiana "has been that a principal is not liable for the negligence of an independent contractor." *Carie v. PSI Energy, Inc.*, 715 N.E.2d 853, 855 (Ind.

1999).  There are five exceptions to this general rule, *Becker v. Kreilein*, 770 N.E.2d 315, 318 (Ind. 2002); however, the Plaintiffs do not argue that any of them apply in this case.  Instead, the Plaintiffs solely contest whether Ms. Price was an independent contractor.  [Dkt. 125 at 43-46.]

Whether one acts as an employee or as an independent contractor is generally a question for the finder of fact.  *Moberly v. Day,* 757 N.E.2d 1007, 1009 (Ind. 2001).  If the significant underlying facts are undisputed, however, the Court may properly determine a worker's classification as a matter of law.  *Id.*  Indiana utilizes a ten-factor test from the Restatement (Second) of Agency to distinguish employees from independent contractors.  *Moberly*, 757 N.E.2d at 1010.  The factors include:

 i. the extent of control which, by the agreement, the master may exercise over the details of the work;

 ii. whether or not the one employed is engaged in a distinct occupation or business;

 iii. the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;

 iv. the skill required in the particular occupation;

 v. whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;

 vi. the length of time for which the person is employed;

 vii. the method of payment, whether by the time or by the job;

 viii. whether or not the work is a part of the regular business of the employer;

 ix. whether or not the parties believe they are creating the relationship of master and servant; and

 x. whether the principal is or is not in business.

*Moberly*, 757 N.E.2d at 1010 (quoting Restatement (Second) of Agency § 220(2) (1958)).  The Court will consider all ten factors, and no one factor is dispositive.  *Moberly*, 757 N.E.2d at

- 11 -

1010.  "[A]lthough not dispositive, the right to control the manner and means by which the work is to be accomplished is the single most important factor in determining the existence of an employer-employee relationship."  *GKN Co. v. Magness*, 744 N.E.2d 397, 403 (Ind. 2001).

The parties focus on the nature of AMR's relationship with ExamOne and LabOne, as well as AMR's relationship with Mr. Ammerman and Ms. Price, but Ms. Price's status in relation to the other parties is the ultimate issue.  In other words, if Ms. Price is an independent contractor, the status of the other Collection Defendants in relation to each other is irrelevant because they would not be liable for her conduct as an independent contractor, given that Plaintiffs do not argue that an exception to the general rule applies.  Therefore, the Court will begin its analysis with Ms. Price.

> i.      *Control*

An employee is one "employed to perform services in the affairs of another and who with respect to the physical conduct in the performance of the services is subject to the other's control or right to control."  *Guillaume v. Hall Farms, Inc.*, 914 N.E.2d 784, 789 (Ind. Ct. App. 2009).  Merely setting a work schedule is not sufficient to support a finding that a given person is an employee rather than an independent contractor.  *Estate of Suskovich v. Anthem Health Plans*, 553 F.3d 559, 566 (7th Cir. 2009) (applying Indiana law).  Rather, the question is whether the details of the work were in the control of the principal or the worker.  *Id.*

Prior to the day of the testing at Western & Southern, Ms. Price had not worked with any of the Collection Defendants in connection with administering observed drug tests.  [Dkt. 107-5 at 20.]  Aside from Mr. Ammerman, she did not have any contact with them before the observed collection.  [Dkt. 107-5 at 20.]  Thus, those defendants did not exert control over the details of Ms. Price's work.  As for Mr. Ammerman, the designated evidence indicates that he told Ms.

Price the date and location of the testing and when he would pick her up, and that he gave her a sheet summarizing the DOT procedures for administering an observed drug test. [Dkt. 107-4 at 37.] He does not remember asking her if she had ever conducted an observed collection. [*Id.*]

The Court concludes that Ms. Price controlled the details of how the observed collection was conducted and that she was only accountable to Mr. Ammerman for the ultimate results— *i.e.*, obtaining the samples after observing the employees. While Mr. Ammerman gave her a summary of the DOT procedures, there is no evidence that Mr. Ammerman had a detailed discussion with Ms. Price about how to observe the female employees. In fact, key allegations (that Ms. Price ordered the Plaintiffs to bend over after they lowered their pants and that she touched their clothing) indicate that Ms. Price deviated from the DOT's direct observation procedures and there is no evidence that Mr. Ammerman directed Ms. Price to do those things. [Dkt. 107-1 at 27.] The Court finds that this factor weighs in favor of Ms. Price's status as an independent contractor.

### ii.     Distinct Occupation or Business

Ms. Price was a retired nurse. [Dkt. 107-5 at 28-29.] Although she had performed observed drug tests as a member of that profession, she no longer worked as a nurse and never had conducted an observed test for a private employer. [Dkt. 107-5 at 17.] Because Ms. Price was retired and did not work in the drug testing business, this factor weighs in favor of her status as an independent contractor. *Moberly*, 757 N.E.2d at 1011.

### iii.     Kind of Occupation

This factor focuses on whether the kind of occupation involves work usually done under the direction of an employer or by a specialist without supervision. *Moberly*, 757 N.E.2d at

- 13 -

1010.  It requires reference to the locality.  *Id.*  If both unsupervised specialists and employees perform the work, the factor is "not particularly meaningful."  *Id.* at 1011.

The parties do not cite any evidence in the record regarding the typical independence or supervision of an observed collector in this locale.  Given the lack of evidence on this point, the Court does not find this factor to be particularly meaningful.

### iv.    Skill Required

"Unskilled labor is usually performed by employees, while skilled labor is often performed by independent contractors."  *Walker v. Martin*, 887 N.E.2d 125, 132 (Ind. Ct. App. 2008).  Ms. Price was a registered nurse, although she did not have an up-to-date license or certification at that time because she was retired.  [Dkt. 107-5 at 30-31.]  Although the work did not require Ms. Price to be licensed or particularly skilled, [*see* dkt. 127-24 at 3 (a different female collector's twenty-eight-year-old son with no experience observed male employees at Terre Haute office)], Mr. Ammerman selected Ms. Price because of her skills as a nurse, [dkt. 107-4 at 35, 37].  Therefore, this factor is neutral.

### v.    Source of Instrumentalities, Tools, and Place of Work

A worker who uses another's tools or instrumentalities is normally understood to follow directions, indicating that the owner of the tools is the employer.  *Moberly*, 757 N.E.2d at 1012.  Here, Ms. Price did not bring her own equipment and, instead, used supplies provided by the other Collection Defendants.  [Dkts. 107-5 at 18; 107-4 at 35.]  One of the other Collection Defendants—Quest/LabOne—provides professional liability insurance to AMR "which extends to [its] subcontractors and employees in the provision of services that are billed by ExamOne[,]" such as Ms. Price.  [Dkt. 107-7 at 38.]  While the totality of this factor leans in favor of Ms. Price being considered an employee, the Seventh Circuit Court of Appeals, when applying Indiana

law, noted that this factor "is relatively unimportant." *Estate of Suskovich*, 553 F.3d at 566. Therefore, the Court gives it little weight.

### vi.     Length of Employment

Where a person is engaged for a limited period of work with no expectation of future work, that factor favors independent contractor status. *Estate of Suskovich*, 553 F.3d at 567. Even seasonal work that is not a long-term relationship favors independent contractor status. *Guillaume v. Hall Farms, Inc.*, 914 N.E.2d 784, 790 (Ind. Ct. App. 2009). Here, Ms. Price engaged in one day of work with no expectation there would be any future work with any of the Collection Defendants and, in fact, there has not been any subsequent work. [Dkt. 107-5 at 20.] This factor strongly weighs in favor of Ms. Price being considered an independent contractor.

### vii.     Method of Payment

Payment of a set rate, instead of an hourly wage, is more typical of an independent contractor than an employee. *Guillaume*, 914 N.E.2d at 790 (citing *Moberly*, 757 N.E.2d at 1012). Ms. Price was paid $40 in cash by Mr. Ammerman for observing four female Western & Southern employees during the mass drug test. [Dkt. 107-5 at 18.] Mr. Ammerman determined that rate on his own. [Dkt. 107-4 at 37.] This factor weighs in favor of Ms. Price being an independent contractor.

### viii.     Regular Business

This factor considers whether or not the work at issue is a part of the regular business of the employer. *Moberly*, 757 N.E.2d at 1010. The Collection Defendants, aside from Ms. Price, were involved in the business of drug testing; however, at least with respect to AMR, drug testing was not a regular part of that business. [Dkt. 107-4 at 9 (AMR testimony that drug testing was 5% of its business).] Of the work Mr. Ammerman did for AMR, the drug testing was "not

often," [dkt. 107-4 at 17], and Mr. Ammerman had never conducted a drug test at the office of a private employer before the date in question, [dkt. 107-4 at 28-29, 34].  Because the evidence shows that the Collection Defendants at issue were involved in the drug testing business but that it was not a regular part of the business, this factor is neutral.

<em>ix.      Belief of the Parties</em>

There is no evidence regarding Ms. Price's belief whether she was an employee or an independent contractor of any of the Collection Defendants on the date in question.  There was no written contract, and Ms. Price did not speak to any of the defendants other than Mr. Ammerman before the drug test.  [Dkt. 107-5 at 31.]  There is evidence that AMR and Mr. Ammerman considered Mr. Ammerman to be an independent contractor, [dkts. 107-4 at 19, 35; 107-8 at 27], which indicates that AMR would consider its relationship with Ms. Price, which was even less formal, to be that of an independent contractor as well.  What is clear is that all of the Collection Defendants believed that the relationship with Ms. Price was limited and informal.  For these reasons, the Court finds that this factor weighs in favor of Ms. Price being an independent contractor.

<em>x.      Whether the Principal is in Business</em>

If the principal is in business, this factor favors employee status.  *Moberly*, 757 N.E.2d at 1013.  ExamOne, LabOne, and AMR were undoubtedly in business.  Analyzing Mr. Ammerman's business status is more difficult because it appears that he worked for various companies, likely as an independent contractor, doing paramedical exams for insurance companies and drug testing.  [Dkt. 107-4 at 29.]  This was the first time, however, that he had to find someone to help him conduct a test.  [Dkt. 107-4 at 37.]  Therefore, because Mr. Ammerman was not "in busi-

- 16 -

ness" in terms of hiring individuals to help him administer observed drug tests, this factor favors Ms. Price's status as an independent contractor.

### 2)  Totality and Effect of All Factors

The Court finds that the vast majority of the factors weigh in favor of Ms. Price being considered an independent contractor.  Most persuasively, the length of employment (one day), the method of payment (a $40 lump sum in cash), the belief of the parties (that this was an informal, limited relationship), and the extent of control over the material details (minimal) strongly favor Ms. Price's status as an independent contractor.  And significantly, Ms. Price had no prior work relationship with any of the Collection Defendants in this capacity prior to the date in question, and she has had no work relationship with them since.  Accordingly, the Court concludes that the undisputed evidence establishes that Ms. Price was an independent contractor.

As stated previously, the Plaintiffs make no argument that an exception to the general rule that a principal is relieved of liability for the actions of an independent contractor should apply in this case.  Given the lack of argument in favor of an exception, the general rule applies. Therefore, the Court concludes that, with the exception of Ms. Price, summary judgment in favor of the Collection Defendants is appropriate on all of the Plaintiffs' claims.  *See Moberly*, 757 N.E.2d at 1013 (affirming summary judgment in favor of the principal after concluding that worker was independent contractor based on ten-factor test).

Western & Southern does not argue that any of the Collection Defendants, including Ms. Price, were independent contractors and that it is free from liability on that basis.  [Dkt. 124.]  In fact, during briefing, Western & Southern disclaimed liability by arguing that Ms. Price's actions were not tortious, and that no one from Western & Southern touched Ms. Lockhart.  [Dkt. 124 at 8.]  However, at no point during briefing does Western & Southern develop any argument that it

cannot be vicariously liable for the actions of the Collection Defendants, including Ms. Price, as a matter of law. The Court will not develop this argument for Western & Southern and, therefore, judgment will not be entered in favor of it on that issue at this time. *See Greenlaw v. United States*, 554 U.S. 237, 243-44 (2008) ("[W]e rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present…. Our adversary system is designed around the premise that the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief.").

### D.  Intentional Infliction of Emotional Distress

In light of the foregoing ruling, the remaining claims in this action are Ms. Lockhart's claims against Western & Southern and both Plaintiffs' claims against Ms. Price. Those defendants filed separate motions for summary judgment and advance slightly different arguments because Ms. Lockhart's claims against Western & Southern stem from Western & Southern's allegedly tortious conduct, while Plaintiffs' claims against Ms. Price stem from Ms. Price's allegedly tortious conduct. Because the same legal principals apply to these claims, the Court will address them together, differentiating between the remaining defendants when necessary.

The parties dispute whether summary judgment on Plaintiffs' intentional infliction of emotional distress claim is appropriate. Specifically, the parties dispute whether the defendants' conduct was extreme and outrageous and whether they acted with the requisite level of intent.

Indiana first recognized the tort of intentional infliction of emotional distress in *Cullison v. Medley*, 570 N.E.2d 27, 31 (Ind. 1991). The definition of the tort is "one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another." *Id.* "It is the intent to harm one emotionally that constitutes the basis for the tort." *Id.* Thus, the elements of the tort are that a defendant (1) engages in extreme and outrageous conduct that (2)

- 18 -

intentionally or recklessly (3) causes (4) severe emotional distress to another. *Branham v. Celadon Trucking Services, Inc.*, 744 N.E.2d 514, 523 (Ind. Ct. App. 2001). The requirements to prove the tort are "rigorous." *Ledbetter v. Ross*, 725 N.E.2d 120, 124 (Ind. Ct. App. 2000).

With regard to Western & Southern, there is no evidence that its decision to order the observed drug test was done with an intentional or reckless intent to harm Ms. Lockhart. Ms. Lockhart argues that Western & Southern's decision was reckless because she was not charged with any crime, she was not accused of circumventing previous drug tests, she did not sign a document consenting to an observed drug test, and it conducted minimal investigation into Mr. White's allegations or the appropriate standards for an observed drug test. [Dkt. 126 at 22-23.] But even if the foregoing are true, Ms. Lockhart has failed to put forth any evidence that Western & Southern's decision to order an observed drug test on all of its employees was done with the intent to emotionally harm Ms. Lockhart. In other words, Western & Southern's decision to subject all of its employees to the same test, even those employees in different offices from Ms. Lockhart, completely undercuts a necessary element of this rigorous tort—that Western & Southern intended to harm Ms. Lockhart emotionally. *See Cullison*, 570 N.E.2d at 31 ("It is the intent to harm one emotionally that constitutes the basis for the tort."). Accordingly, the Court grants summary judgment in favor of Western & Southern on Ms. Lockhart's claim for intentional infliction of emotional distress.

With regard to Ms. Price, the Court also concludes that Plaintiffs have failed to designate any evidence that Ms. Price intentionally or recklessly intended to harm them emotionally. In support of this element of their claim, Plaintiffs' only argument is that Ms. Price's imposition of

requirements beyond the DOT guidelines,[9] that is, making Plaintiffs bend over and by watching them wipe and pull up their underwear, shows that she recklessly intended to harm them emotionally.  [Dkt. 125 at 50-51.]  There is no evidence supporting this conclusion, however, and the designated evidence shows that Ms. Price used the same procedure with Plaintiffs' manager, who is not a party to this case.  [Dkt. 107-21 at 25.]  Plaintiffs' suggested inference is neither supported by admissible evidence nor reasonable.  Because there is no evidence that Ms. Price did anything during the observed collection, either intentionally or recklessly, to attempt to harm either of the Plaintiffs emotionally, summary judgment is appropriate in favor of Ms. Price on Plaintiffs' intentional infliction of emotional distress claim.

### E.  Negligent Infliction of Emotional Distress

Plaintiffs also assert a negligent infliction of emotional distress claim.  Defendants seek judgment as a matter of law on that claim on the following bases:  that Plaintiffs allegedly consented to the conduct at issue, that Plaintiffs' alleged reaction is unreasonable, and that the touching in question fails to satisfy Indiana's modified-impact rule.  Defendants also seek to limit certain elements of damage.  As will be addressed in more detail below, a critical—but perhaps understandable—gap in the briefing exists, as the parties largely ignore whether either of the remaining defendants owed a predicate duty on which a negligent infliction of emotional distress claim must be based.

#### 1)  *Material Issues of Fact Surrounding Consent and Damages*

The Defendants argue that Plaintiffs cannot recover on the remaining torts because they consented to the conduct underlying those claims and, even if they did not consent, they have not

---

[9] Again, while the undisputed evidence establishes that all Defendants had access to the DOT regulations, it is equally undisputed that the tests in question were not legally subjected to those regulations.

sustained the requisite level of emotional distress to support their claims.  These arguments do not warrant much discussion at this stage of the proceedings because the admissible evidence, which the Court must accept as true, establishes that there are material issues of fact surrounding the Plaintiffs' alleged consent and the level of distress sustained.

With regard to consent, the Court cannot find that Plaintiffs consented to the allegedly tortious conduct as a matter of law because Western & Southern's drug testing policy does not disclose the possibility of observed drug tests.  Therefore, there is no evidence that they "consented" to this type of drug test simply because they were aware that Western & Southern had a drug testing policy.  Moreover, both Plaintiffs questioned the propriety of Ms. Price's instructions during the observed collection.  [Dkts. 107-20 at 22; 107-21 at 23.]  Also, the issue of consent is related to the question of duty discussed below.  For those reasons, the Court cannot grant summary judgment to the remaining defendants on the basis of consent because there are issues of material fact regarding whether they actually consented to the observed drug tests.

Likewise, issues of fact remain regarding the foreseeability of the alleged injuries, whether the observed collection was the sole cause of Plaintiffs' alleged emotional distress, and what would constitute a reasonable person's reaction to the alleged events.[10]  *See, e.g.*, *Dollar Inn v. Slone*, 695 N.E.2d 185, 190 (Ind. Ct. App. 1998) ("It is axiomatic that questions of reasonableness belong exclusively to the jury.").

The Court does agree with the Defendants, however, that the Plaintiffs cannot recover for any emotional distress caused by their decision to pursue this litigation.  *See Stoleson v. United States*, 708 F.2d 1217, 1223 (7th Cir. 1983) ("It would be strange if stress induced by litigation

---

[10] Because the Court has not relied on the testimony of the Plaintiffs' mental health providers, the Collection Defendants' motion to preclude their testimony is denied as moot, without prejudice to raise those issues *in limine* before trial.  [Dkt. 102.]

- 21 -

could be attributed in law to the tortfeasor.  An alleged tortfeasor should have the right to defend himself in court without thereby multiplying his damages.").  Therefore, the damages instruction provided to the jury will instruct them not to consider any distress that Plaintiffs sustained by pursuing this litigation.

   2)  *Duty*

The Indiana Supreme Court recently emphasized that a "stand-alone action[] for negligent infliction of emotional distress [is] not cognizable in Indiana" and that an action seeking damages for emotional distress cannot be "predicated upon a breach of an alleged duty not to inflict emotional injury on another."  *Spangler v. Bechtel*, 958 N.E.2d 458, 466 (Ind. 2011).  Instead, under any of the scenarios that can constitute negligent infliction of emotional distress, "the defendant's negligence in breaching a legal duty is a required predicate."[11]  *Id.*

The parties largely ignore any discussion regarding the nature of any legal duty Western & Southern and Ms. Price could have owed to the Plaintiffs.  Western & Southern argues for the first time in its reply that it "satisfied any duty it owed" to Ms. Lockhart, [dkt. 137 at 12], but it does not specify what its duty may have been or cite any case law supporting that conclusion.  Likewise, the Collection Defendants argue that Plaintiffs either failed to allege that AMR, LabOne, ExamOne, or Mr. Ammerman owed them a duty or that those defendants satisfied any duty that was owed.  [Dkt. 106 at 13-14, 14 n. 11, 36-38.]  These arguments, however, are not advanced with regard to Ms. Price.  While the Court would typically find undeveloped arguments to be waived, in this circumstance, whether Western & Southern and Ms. Price owed the

_____

[11] Ms. Price cites this language in support of her argument that Plaintiffs cannot recover for negligent infliction of emotional distress because there "is no evidence of negligent conduct."  [Dkt. 106 at 33-35.]  Because the issue of duty remains an open question, however, the defendants' negligence in breaching any duty cannot be foreclosed at this time.

Plaintiffs a duty appears to be an issue of first impression in Indiana, and one that is case deter-

minative.

Whether a defendant must conform his conduct to a certain standard for a plaintiff's ben-

efit is a question of law.[12] *Estate of Heck ex rel. Heck v. Stoffer*, 786 N.E.2d 265, 268 (Ind.

2003). "Courts will generally find a duty where reasonable persons would recognize and agree

that it exists." *Id.* The Indiana Supreme Court has developed a balancing test to determine

whether a duty exists at common law, *Webb v. Jarvis*, 575 N.E.2d 992, 995 (Ind. 1991). The

three factors to be balanced include the relationship between the parties, the reasonable foreseea-

bility of harm, and public policy considerations. *Id.* The Indiana Supreme Court recently opined

that "[n]otwithstanding the helpfulness of the *Webb* test in many situations, a precise formula-

tion of the basis for finding duty has proven quite elusive." *Pfenning v. Lineman*, 947 N.E.2d

392, 398 (Ind. 2011).

The parties do not cite any cases from Indiana dealing with workplace drug testing by

private employers. The Court was able to locate one Indiana case where a private employer fired

an employee who appeared intoxicated at work but refused to submit to a blood alcohol test pur-

suant to the employer's policy.[13] *Butler v. Rev. Bd. of Ind. Dep't of Employ. & Training*, 633

N.E.2d 310, 313 (Ind. Ct. App. 1994). In the context of affirming a denial of unemployment

---

[12] Because the question of duty is a matter of law, the Court has not considered Plaintiffs' expert report from Dr. Robert Swotinsky. Accordingly, the Collection Defendants' motion to preclude testimony by Dr. Swotinsky on summary judgment is denied as moot without prejudice to raise the issues addressed in those motions *in limine* before trial. [Dkt. 101.]

[13] Federal courts have addressed employment discrimination claims resulting from a private em-ployer's decision to drug test and terminate an employee allegedly based on his race, *see, e.g.*, *Keys v. Foamex L.P.*, 264 Fed. Appx. 507 (7th Cir. 2008), but those cases are factually distinct and do not address possible common law tort claims regarding the manner in which the test was conducted.

benefits, the Indiana Court of Appeals recognized that "a private employer has a right to insure that its workers are drug and alcohol free while on the job." *Id.* *Butler* did not address possible tort claims arising from the testing, the nature of any duty owed, or whether the aforementioned right forecloses tort liability in the context of workplace drug testing. *Id.*   Additionally, unlike the private employee in *Butler*, here there was no particularized suspicion regarding drug use or testing circumvention by Ms. Lockhart or Ms. Shick. [Dkt. 107-1 at 10.]   And it appears that the employer in *Butler* followed an announced drug testing procedure, while Western & Southern's policy did not disclose the possibility of observed collections or drug tests occurring on its property. [Dkt. 127-8.]  Whether those differences are material is likewise unresolved.

The parties also ignore that Ms. Lockhart and Ms. Shick were at-will employees.  [Dkts. 106 at 6 (asserting Plaintiffs' at-will employment as a material fact not in dispute); 125 (not disputing assertion).]   An at-will employee may generally be discharged for any cause or for no cause without the employer incurring liability,[14] *Cripe, Inc. v. Clark*, 834 N.E.2d 731, 734 (Ind. Ct. App. 2005), and Indiana does not recognize a duty of good faith and fair dealing owed by an employer to an at-will employee regarding the terms of employment, *Hamblen v. Danners, Inc.*, 478 N.E.2d 926, 929 (Ind. Ct. App. 1985).  There appears to be some support for the position that when an employer unilaterally changes agreed-upon employment terms, the at-will employee may either accept the changes and continue employment under the new terms or reject the changes and quit work, *Wheeler v. Balemaster*, 601 N.E.2d 447, 448 (Ind. Ct. App. 1992); *see also Weiser v. Godby Bros.*, 659 N.E.2d 237, 239 (Ind. Ct. App. 1995) (citing *Wheeler* for that proposition before distinguishing it).  It does not appear that the Indiana Supreme Court has en-

---

[14] There are a few exceptions to this rule, *see Cripe, Inc.*, 834 N.E.2d at 734, and of course an employee who suffers an adverse employment action as a result of discrimination based on race, gender, or national origin discrimination may pursue relief under Title VII or 42 U.S.C. § 1981.

dorsed that principle, however, and *Wheeler* and *Weiser* may be distinguishable because they dealt with compensation.

Rule 64 of the Indiana Rules of Appellate Procedure permits a federal district court to certify a question of Indiana law to the Indiana Supreme Court "when it appears to the federal court that a proceeding presents an issue of state law that is determinative of the case and on which there is no clear controlling Indiana precedent." Certification is appropriate "when the case concerns a matter of vital public concern, where the issue will likely recur in other cases, where resolution of the question to be certified is outcome determinative of the case, and where the state supreme court has yet to have an opportunity to illuminate a clear path on the issue." *State Farm Mut. Auto Ins. Co. v. Pate*, 275 F.3d 666, 672 (7th Cir. 2001).

Because it does not appear that there are any Indiana cases addressing tort claims arising from the drug testing of a private, at-will employee, the Indiana Supreme Court has not had an opportunity to address the issue of any possible duty owed in this context. Whether any duty is owed by the employer and/or the tester and the nature of any potential duties are issues of state law that concern matters of vital public concern and are best left to the Indiana Supreme Court to decide. For these reasons, the Court certifies the following questions to the Indiana Supreme Court by separate entry:

> Does a private employer owe a duty of care to an at-will employee in the context of workplace drug testing? If so, what is the nature of any duty owed?

> Does a tester who is an independent contractor of a private employer owe a duty of care to a testee in conducting a drug test? If so, what is the nature of any duty owed?

If the Indiana Supreme Court accepts any of the questions that this Court certifies in this opinion, it can, of course, reword the questions as it sees fit. *See Green v. Ford Motor Co.*, 942 N.E.2d 791, 796 (Ind. 2011) (revising and restating certified question).

- 25 -

3)  *Impact*

The parties agree that for purposes of summary judgment, the Court must accept as true Plaintiffs' allegations that Ms. Price adjusted their vests either immediately before or after observing the drug test and that the Plaintiffs felt Ms. Price's hands touch them.  [Dkts. 127-10 at 2; 127-11 at 2.]  The parties dispute whether Ms. Price touching their vests was sufficient to constitute the impact required to sustain a negligent infliction of emotional distress claim.  Additionally, the Defendants contend that the vest touching is insufficient impact to sustain a negligent infliction of emotional distress claim because Plaintiffs do not allege that the vest touching itself caused their emotional distress.  [Dkts. 136 at 5; 137 at 13-14.]

The Indiana Supreme Court has held that the direct impact sustained by the plaintiff must be a physical one; however, it "does not need to cause physical injury to the plaintiff" and "the emotional trauma suffered by the plaintiff does not need to result from a physical injury caused by the impact."  *Atlantic Coast Airlines v. Cook*, 857 N.E.2d 989, 996 (Ind. 2006).  In answering a rhetorical question regarding how to assess whether the degree of impact is sufficient to satisfy the requirement of the modified-impact rule, the Indiana Supreme Court said:

> [W]hen the courts have been satisfied that the facts of a particular case are such that the alleged mental anguish was not likely speculative, exaggerated, fictitious, or unforeseeable, then the claimant has been allowed to proceed with an emotional distress claim for damages even though the physical impact was slight, or the evidence of physical impact seemed to have been rather tenuous.

*Id.*  The Indiana Supreme Court has also held that it "matters little how the physical impact occurs, so long as that impact arises from the plaintiff's direct involvement in the tortfeasor's negligent conduct."  *Conder v. Wood*, 716 N.E.2d 432, 435 (Ind. 1999).

The case law Defendants cite in support of their position that the vest touching must have caused the emotional distress, *Shuamber v. Henderson*, 579 N.E.2d 452, 456 (Ind. 1991), has

been overruled in part, *see Allstate Ins. Co. v. Tozer*, 392 F.3d 950, 954 (7th Cir. 2004) (recognizing that *Shuamber* was overruled by *Groves v. Taylor*, 729 N.E.2d 569, 573 (Ind. 2000)), and refined by more recent Indiana Supreme Court decisions.  For example, in *Condor v. Wood*, 716 N.E.2d 432, 435 (Ind. 1999), the Indiana Supreme Court upheld an impact as sufficient to satisfy the modified-impact rule when the plaintiff initiated the impact by pounding her fist on the side of a truck in a frantic attempt to get the driver to stop before it rolled over her co-worker.  The Indiana Supreme Court considered that impact to be sufficient because it arose from the plaintiff's direct involvement with the tortfeasor's negligent conduct, even though the tortfeasor did not initiate the impact with the plaintiff.  *Id.*

By analogy then, Ms. Price's touching of the Plaintiffs' vests resulted from Plaintiffs' direct involvement with the conduct that allegedly caused the Plaintiffs' emotional distress.  In other words, without Western & Southern ordering the observed drug test and without Ms. Price conducting it, Plaintiffs would not have removed their vests and Ms. Price would not have touched them.  The Court's conclusion that this impact is sufficient to satisfy the modified-impact rule is bolstered by the Indiana Supreme Court's holding in *Atlantic Coast Airlines* that the touching "does not need to cause physical injury to the plaintiff" and "the emotional trauma suffered by the plaintiff does not need to result from a physical injury caused by the impact." 857 N.E.2d at 996.  The Indiana Supreme Court has also held that it "matters little how the physical impact occurs, so long as that impact arises from the plaintiff's direct involvement in the tortfeasor's negligent conduct."  *Condor*, 716 N.E.2d at 435; *see also Ross v. Cheema*, 716 N.E.2d 435 (Ind. 1999).

For these reasons, and only if a predicate duty is established by the Indiana Supreme Court, the Court concludes that because the alleged impact in this case—Plaintiffs feeling Ms.

Price touching their vests—arose from Plaintiffs' direct involvement with Ms. Price during the observed drug test, it is sufficient to satisfy the modified-impact rule.

### F.  Invasion of Privacy by Intrusion Upon Seclusion

The last claim at issue is Plaintiffs' claim for invasion of privacy by intrusion upon seclusion.  Ms. Price argues that Plaintiffs had a diminished privacy interest because they had notice of Western & Southern's drug testing policy and Western & Southern had a legitimate interest in addressing claims of drug abuse by its employees.  [Dkt. 106 at 29.]  Although Western & Southern did not anticipate Plaintiffs' invasion of privacy claim in their motion, on reply they argue that there are no facts to support that claim and that Plaintiffs' alleged consent is a bar to Western & Southern's liability.[15]  [Dkt. 137 at 16.]

Plaintiffs contend that Ms. Price's visual inspection during the observed drug test intruded on their personal privacy.  [Dkt. 125 at 52-54.]  Plaintiffs emphasize that Western & Southern's drug testing policy did not disclose the possibility of observed collections and that there was no particularized suspicion as to either of them.  [Dkt. 125 at 52-54.]  Therefore, Plaintiffs contend that summary judgment on their claim is inappropriate.

#### 1)  Sufficiency of Pleadings

Defendants argue that Plaintiffs did not adequately plead a claim for invasion of privacy by intrusion upon seclusion.  [Dkts. 106 at 28 n.27; 137 at 15-16.]  They ignore, however, that the federal rules contain a notice-pleading standard and that "[t]he intent of the liberal notice pleading system is to ensure that claims are determined on their merits."  *E.E.O.C. v. Concentra Health Services, Inc.*, 496 F.3d 773, 779 (7th Cir. 2007).  Plaintiffs adequately pled the events

---

[15] The Court cannot grant summary judgment in favor of the Defendants at this time on the consent defense for the reasons explained in Part III.E.1, *supra*.

surrounding their claims to put the defendants on notice of the conduct they believed was action-able, and an invasion of privacy claim is a plausible extension of those allegations—*i.e.*, that Ms. Price "visually inspected the *private* body parts of each plaintiff in the lower rear area of their bodies, while they were in a bent over position" and then directed each of them to urinate into a cup while she watched. [Dkt. 54 at 16, 19 (emphasis added).]  Moreover, the Collection Defend-ants moved for summary judgment on the invasion of privacy claim in their opening brief, which confirms that the parties had notice of that claim. [Dkt. 106 at 27-30.]  Therefore, the Court con-cludes that Plaintiffs pled an invasion of privacy claim.[16]

### 2)  *Scope of Privacy Tort in Indiana Unsettled*

The parties ignore that the scope of the tort of invasion of privacy in Indiana is "not yet settled."  *Allstate Ins. Co. v. Dana Corp.*, 759 N.E.2d 1049, 1056-57 (Ind. 2001) ("The extent to which the tort of invasion of privacy is recognized in Indiana is not yet settled.").  Indiana has generally recognized a privacy tort and cites the Second Restatement of Torts, which describes four distinct injuries:  1) intrusion upon seclusion, 2) appropriation of likeness, 3) public disclo-sure of private facts, and 4) false-light publicity.  *Doe v. Methodist Hosp.*, 690 N.E.2d 681, 684 (Ind. 1997).  The Indiana Supreme Court has cautioned, however, that these separate harms are "only tenuously related" and that "recognizing one branch of the privacy tort does not entail rec-

---

[16] The Court notes that for reasons not obvious to it, it does not appear that the Defendants served contention interrogatories to verify the claims or causes of action that Plaintiffs intended to pursue.  Contention interrogatories would have confirmed that Plaintiffs were pursuing an in-vasion of privacy claim and eliminated the need for briefing on the false imprisonment claim that the Plaintiffs subsequently abandoned.  [Dkt. 106 at 30-32.]  Likewise, it is unclear why the Plaintiffs did not notify the Defendants that they were abandoning their false imprisonment claim before summary judgment.  [Dkt. 125 at 54.]  Communication, which is a two-way street, would have saved all of the parties the time, money, and energy spent developing unnecessary argu-ments.

ognizing all four." *Id.* at 684-85. In a plurality opinion, the Indiana Supreme Court chose not to endorse the sub-tort of disclosure. *Id.* at 693.

Although Indiana has not expressly recognized the sub-tort of intrusion upon seclusion since noting that the scope of the privacy tort is "unsettled," *Dana Corp.*, 759 N.E.2d at 1056-57, Indiana courts typically assume that it could be actionable but emphasize that it is "narrowly construed" and find the facts of the cases at bar insufficient to support a claim, *see, e.g.*, *Curry v. Whitaker*, 943 N.E.2d 354, 358 (Ind. Ct. App. 2011) (providing a helpful summary of the case law and holding that plaintiffs' claims that the defendants invaded upon their personal solitude by filming them entering and leaving their home was not actionable as intrusion upon seclusion).

There have been no cases in which a claim for intrusion upon seclusion was proven without physical contact or an invasion of the plaintiff's physical space, such as his home. *Curry*, 943 N.E.2d at 358. While this may lead to an inference that Plaintiffs cannot sustain an action for invasion of privacy by intrusion upon seclusion, assuming that tort is formally recognized in Indiana, case law surrounding various privacy interests in the drug testing context may suggest otherwise. For example, in drug testing public employees where Fourth Amendment concerns are implicated,[17] courts have generally recognized the privacy concerns associated with the collection of urine. *See Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 617 (1989) ("Nor can it be disputed that the process of collecting the sample to be tested, which may in some cases involve visual or aural monitoring of the act of urination, itself implicates privacy interests."); *Tay-*

---

[17] A search and seizure by a private party who is not acting as an instrument or agent of the government does not implicate the Fourth Amendment. *United States v. Shahid*, 117 F.3d 322, 325 (7th Cir. 1997); *see also Butler*, 633 N.E.2d at 313 ("Because the present case also does not involve state action, Butler's Fourth Amendment right to be free from unreasonable searches is not implicated."). There is no dispute that the parties in this case were private entities or individuals who were not acting under any governmental authority in conducting the observed drug tests of the Plaintiffs.

*lor v. O'Grady*, 888 F.2d 1189, 1197 (7th Cir. 1989) ("This court, along with others, has previously noted the nearly universally held expectations of privacy attached to the act of urination. . . .  All urinalysis programs implicate serious privacy concerns regardless of how carefully tailored the program is designed.").  But at least one court in Indiana has noted in the public employee drug testing context that the "presence of a preconceived, legitimate drug screening policy minimizes the search's intrusiveness."  *Miller v. Vanderburgh County*, 610 N.E.2d 858, 863 (Ind. Ct. App. 1993) (analyzing Fourth Amendment reasonableness of drug test of public employee where employer had no formal drug testing policy in place).[18]

As previously discussed, the Court was unable to locate any Indiana cases addressing tort claims asserted by an at-will employee as the result of an observed urinalysis drug test conducted at the direction of a private employer.  Moreover, the scope of the tort of invasion of privacy by intrusion upon seclusion remains unsettled in Indiana.  Express recognition of that tort, particularly in the context of observed drug testing in the private employment setting, concerns issues of state law and matters of vital public concern best left to the Indiana Supreme Court to decide.  For these reasons, the Court certifies the following question to the Indiana Supreme Court by separate entry:

---

[18] In *Oman v. State*, the Indiana Supreme Court addressed a situation where a firefighter tested positive for marijuana after the truck he was driving collided with another vehicle on the way to a fire call.  737 N.E.2d 1131 (Ind. 2000).  Acting on a tip that the firefighter had tested positive, the county prosecutor subpoenaed the test results and ultimately charged the firefighter with driving while intoxicated.  The Indiana Supreme Court held that the subpoena was reasonable, the public employee testing program at issue was constitutionally sound, and that the trial court did not err in admitting the toxicology results.  While the issues presented by that case are vastly different then the issues presented here, and the employer in *Oman* was a public entity, the Indiana Supreme Court did recognize that it had never considered an individual's privacy interest in toxicology tests results as a matter of state law, but it declined to resolve the issue in that case.  *Id.*

Does Indiana recognize the tort of invasion of privacy by intrusion upon seclusion and, if so, could an observed urinalysis drug test conducted at the direction of a private employer on an at-will employee form the basis of that action?

## IV.
### CONCLUSION

The Collection Defendants' motions to preclude testimony by Dr. Swotinsky and Plaintiffs' mental health providers are **DENIED WITHOUT PREJUDICE** to raise the issues addressed in those motions *in limine* before trial.  [Dkts. 101; 102.]  Accordingly, Western & Southern's motions to join those motions are **DENIED AS MOOT**.  [Dkts. 110; 111.]

The Defendants' summary judgment motions are **GRANTED IN PART** and **DENIED IN PART** as follows.  [Dkts. 103; 105.]

Plaintiffs abandoned their claim for false imprisonment during briefing; therefore, the Court **GRANTS** summary judgment in favor of all of the Defendants on that claim.  For the reasons stated herein, the Court concludes that Ms. Price was an independent contractor; therefore, it **GRANTS** summary judgment in favor of Defendants American Medical Review, Inc.; Estate of Stephen Ammerman; ExamOne World Wide, Inc.; and Quest Diagnostics on all of Plaintiffs' claims as a matter of law.  The Clerk is directed to terminate those parties from this action on this Court's docket.

The Court **GRANTS** summary judgment in favor of Western & Southern on Ms. Lockhart's intentional infliction of emotional distress claim and in favor of Ms. Price on both Plaintiffs' claims for intentional infliction of emotional distress.

With regard to Plaintiffs' claims for negligent infliction of emotional distress and invasion of privacy by intrusion upon seclusion against Western & Southern and Ms. Price, the Court **CERTIFIES** three questions to the Indiana Supreme Court by separate entry pursuant to Indiana Appellate Rule 64.  Accordingly, Western & Southern and Ms. Price's requests for summary

judgment on those claims are **DENIED,** but **without prejudice** to further argument following

review by the Indiana Supreme Court.

10/17/2012

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only:**

Stephen M. Brandenburg
JOHNSON & BELL, LTD.
brandenburgs@jbltd.com

D. Faye Caldwell
CALDWELL EVERSON PLLC
fcaldwell@caldwellclinton.com

Douglas A. Enloe
GOSNELL BORDEN ENLOE & SLOSS, LTD
gbes@gbeslaw.com

Derek W. McCullough
GOSNELL, BORDEN ENLOE, SLOSS, & MCCULLOUGH, LTD.
gbes@gbeslaw.com

Richard L. Moore
FROST BROWN TODD LLC
rlmoore@fbtlaw.com

Kyle T. Ring
WILLIAMS LAW FIRM
kyle@williamsinjurylaw.com

Sharon L. Stanzione
JOHNSON & BELL, LTD.
stanziones@jbltd.com

Stephen L. Williams
WILLIAMS LAW FIRM
steve@williamsinjurylaw.com

Amy Suzanne Wilson
FROST BROWN TODD LLC
awilson@fbtlaw.com